UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. MARY ROOF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HOWARD UNIVERSITY | ) | Civil Action No. 1:07-CV-00639 (ESH) |
| | ) | |
| and | ) | |
| | ) | |
| DR. IAN I. SMART, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT HOWARD UNIVERSITY'S MOTION TO DISMISS THE AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS, AND FOR A STAY OF DISCOVERY

Pursuant to Fed. R. Civ. P. 12(b)(6), defendant Howard University ("University") moves to dismiss plaintiff Mary Roof's Amended Complaint for failure to state a claim upon which relief can be granted. In the alternative, the University moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

The Amended Complaint alleges that Plaintiff was subject to a racially-discriminatory "hostile environment" at the University, in violation of Title VII and the D.C. Human Rights Act. The hostile environment allegedly arose through five e-mails that another faculty member (Dr. Smart) sent over a four-day period in January 2006, and two e-mails sent almost fifteen months later in April 2007. For the reasons set forth in the accompanying memorandum, the allegations are legally insufficient to state a hostile-environment claim against the University.

Pursuant to Fed. R. Civ. P. 26(c) and Local Civil Rule 26.2(a), the University also seeks a stay of discovery pending a ruling on the University's motion to dismiss and the Court's issuance of a Pre-Trial Order. Such a stay will serve to avoid imposing on the University the potentially unnecessary and substantial expense of responding to numerous document requests, interrogatories, requests for admissions, and deposition notice already propounded by Plaintiff.

A proposed Order is provided.

Pursuant to Local Civil Rule 7(m), counsel for the University has consulted with Plaintiff's counsel respecting this motion, and Plaintiff's counsel will not consent to the motion.

Respectfully submitted,

Daniel I. Prywes (D.C. Bar No. 342394)
Stacey Terry Ormsby (D.C. Bar No. 490995)
BRYAN CAVE LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005
Phone: (202) 508-6000
Fax:    (202) 220-7394

Dated: July 11, 2007                    Counsel for Defendant Howard University

## CERTIFICATE OF SERVICE

I hereby certify that, on July 11, 2007, I caused a true and correct copy of the foregoing

Motion, supporting memorandum, and proposed Order to be served upon the following via ECF:

R. Scott Oswald, Esq.
Adam Augustine Carter, Esq.
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006

*Counsel for Plaintiff*

John F. Karl, Jr., Esq.
Karl & Tarone
Suite 1250
900 Seventeenth Street, N.W.
Washington, D.C.  20006

*Counsel for Defendant Ian Smart, Ph.D.*

Daniel I. Prywes

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DR. MARY ROOF,               )
                         )
        Plaintiff,      )
                         )
    v.                    )
                         )
HOWARD UNIVERSITY     )     Civil Action No. 1:07-CV-00639 (ESH)
                         )
    and               )
                         )
DR. IAN I. SMART         )
                         )
        Defendants.   )
                         )

---

## DEFENDANT HOWARD UNIVERSITY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS, AND FOR A STAY OF DISCOVERY

Defendant Howard University ("University") submits this memorandum of law in support of its motion to dismiss the Amended Complaint (hereinafter "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) and (c), and for a stay of discovery pursuant to Fed. R. Civ. P. 26(c) and Local Civil Rule 26.2(a).

## INTRODUCTION AND SUMMARY

Plaintiff Mary Roof, Ph.D. is a tenured faculty member at the University. By her own account, over her 18 years at the University, she has been given "increasingly more responsibility," and has chaired several important faculty committees. (Complaint ¶ 17.)

The Complaint alleges that Plaintiff was subject to a "hostile environment" based on her race (Caucasian) in violation of Title VII of the Civil Rights Act of 1964, as amended, and the D.C. Human Rights Act ("DCHRA"). Plaintiff alleges that the hostile environment was created through

a total of seven e-mails sent by defendant Dr. Ian Smart ("Smart"), another faculty member who holds no leadership positions comparable to her own.

Five of the allegedly "harassing" e-mails were sent over a four-day period between January 9 and 12, 2006. As shown by the University's Answer, they ceased by January 13, 2006 when the Department Chair requested that Smart discontinue his communications and he agreed to "no more e-mails." This occurred even before Plaintiff first complained about the e-mails on January 20, 2006.

Plaintiff sent another e-mail critical of Plaintiff and others on April 2, 2007, but the Complaint does not allege that this later e-mail made any racial remarks about Plaintiff or anyone else. The final e-mail was sent on April 8, 2007, and directs criticism toward Plaintiff primarily on the basis of her allegedly poor supervision of a graduate student. As shown by the Answer, the Department Chair promptly reprimanded Plaintiff about that e-mail. Plaintiff complained about Smart's inappropriate dissemination of negative comments about the student's academic work, but did not complain that the e-mail was racially harassing toward herself.

Plaintiff's claims should be dismissed because, even taking all of the allegations as true, it fails to describe a sufficiently "severe and pervasive" hostile environment to be actionable under Title VII. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The abundant case law, including this Court's rulings, establish that a grand total of seven e-mails – with five sent over the course of a few days and two more almost 15 months later – are insufficient to support a lawsuit for a discriminatory "hostile environment." Three of the e-mails make no comment about Plaintiff's race at all.

The Court should therefore dismiss the Complaint on its face, pursuant to Fed. R. Civ. P. 12(b)(6). In the alternative, the Court may dismiss the case on the pleadings (pursuant to Fed. R. Civ. P. 12(c)) following its review of the allegedly "harassing" e-mails, which are contained as

exhibits to the University's Answer.   By referring to the Answer and the actual e-mails, the Court

can assure itself that it is not dismissing claims based on e-mails that are "sight unseen."

In light of the University's indisputable responses to Smart's e-mails, there is also no basis

for holding the University vicariously liable for the allegedly "offensive" e-mails sent by Dr. Smart.

The University met its obligation to take corrective action and in each case Smart ceased sending

allegedly offensive e-mails following the University's request.

Finally, the Court should also stay discovery while this motion is pending in order to avoid

the need for the University to respond to burdensome and potentially unnecessary discovery.  There

is a strong likelihood that the Court will dismiss the Complaint based on this motion.  Moreover,

Plaintiff violated Local Civil Rule 26.2(a) by serving discovery requests before the conference

required by Fed. R. Civ. P. 26(f).

## THE AMENDED COMPLAINT

According to the Complaint, Plaintiff is a tenured Graduate Associate Professor and a

faculty member of the University's Department of Modern Languages and Literature.  (Complaint ¶

18.)   Plaintiff is Caucasian, and the University is a Historically Black university.  (Id. ¶¶ 13, 16.)

Plaintiff has fared well at the University.  According to the Complaint, during the eighteen

years that she has worked there, she has "been given increasingly more responsibility, as a chair of

the department appointments, promotion and tenure committee, member of the department

director search committee, director of independent studies, director of masters theses, and member

of a doctoral dissertation committee."  (Complaint ¶ 17.)

Defendant Ian Smart, Ph.D. is also tenured and holds the rank of Professor in the same

Department as Plaintiff.  (Complaint ¶ 20.)  Smart is of "African descent," and is a "native of

Trinidad."  (Id. ¶ 19.)   Although Smart holds a higher academic rank than Plaintiff, the Complaint

does not allege that Smart supervised Plaintiff in any way.

3

Defendant Smart holds views that are highly critical of the University. According to the Complaint, he wrote a book detailing his perception that "Howard's identity as a 'Historically Black College and University' is tarnished because it operates like a Civil War-era plantation for its majority African-American student body." (Complaint ¶ 21.) He is the "author of a personal blog" and wrote a book entitled *Dude, Where's My HBCU?* in which he espouses his views. (Id. ¶¶ 21-22.) Because the University has a "majority African American" faculty and student body (id. ¶ 15), Dr. Smart's provocative views are directed against Black faculty and administrators at the University as well as others. He has criticized those who do not share his vision of the University regardless of their race.

Between January 9, 2006 and January 12, 2006, Smart sent some University faculty members and staff, including Plaintiff, the five e-mails referenced in Plaintiff's Complaint. (Complaint ¶¶ 23-29.) Plaintiff characterizes these as "offensive emails that allude to Roof as a privileged Caucasian plantation mistress." (Id. ¶ 3.) However, in the e-mails Dr. Smart primarily suggests that Plaintiff shares the same views that he attributes to the Black majority of faculty at the University – namely, that the University operates as a "Civil-War era plantation." (Complaint ¶ 21.)

According to the Complaint:

-- Dr. Smart sent a January 9, 2006 e-mail (Answer, exhibit A) which claimed that Plaintiff doubted the "viability and even the validity of any graduate program in modern languages and literature at a 'Negro' college, even at the 'Mecca.'" (Complaint ¶ 24.)

-- Dr. Smart sent an e-mail on January 10, 2006 (Answer, exhibit B), describing a "nightmare" in which he was in the military and Plaintiff was a "brigadier general." (Complaint ¶ 26.) No reference was made to Plaintiff's race.

-- Dr. Smart sent an e-mail on January 11, 2006 (Answer, exhibit C), questioning whether Plaintiff enjoys some "special privileged status" at the "Uncle Tom's campus," and referring to her

4

as "an apparently Caucasian woman in her sixties" who is "at best a mediocre scholar." (Complaint ¶ 27.)

-- Dr. Smart sent an e-mail on January 11, 2006 (Answer, exhibit D), with a parody of "slave talk" addressed to "Miss Mary," including the phrase in which he satirically says of himself: "Ah sure is a stupid nigger." (Complaint ¶ 28.)

-- Dr. Smart sent an e-mail on January 12, 2006 (Answer, exhibit E), claiming that the University's Graduate School of Arts and Sciences espouses the view that Blacks should "fit into white society as second-class citizens," and that Plaintiff concurs with that view which, according to Smart, was shared by the Graduate School at a Historically Black University. (Complaint ¶ 29.) No reference was made in the e-mail to Plaintiff's race.

The Complaint proceeds to allege that Plaintiff complained on January 20, 2006 to the Department Chair and others who "were direct recipients" of Dr. Smart's e-mails. (Complaint ¶¶ 33-34.) The Complaint alleges that the University took no action respecting her complaint about Dr. Smart. (Id. ¶ 41.) The Complaint faults the University for not taking corrective action after Plaintiff complained, and after she reported the alleged "discrimination" to the EEOC on March 11, 2006.[1] (Id. ¶¶ 3-4, 34-35, 41, 53-54.)

According to the Complaint, almost 15 months after the January 2006 e-mails, Dr. Smart on April 2, 2007 sent an e-mail to multiple University faculty members, including Plaintiff, and staff which "compared a three-member University committee on which Roof sits with characters in his book *Dude, Where's My HBCU?*" (Complaint ¶ 30.) The Complaint does not allege that this e-mail

---

[1] Nowhere does the Complaint fault the University for not taking "corrective action" between January 9, 2006 (the date of the first e-mail) and January 20, 2006 (the date of Plaintiff's first internal complaint). In any event, the face of the Complaint establishes that no "corrective action" was needed after January 12, 2006 because Dr. Smart had ceased sending allegedly "offensive" e-mails to Plaintiff.

(Answer, exhibit F) made any negative reference to Plaintiff's race or singled her out from among the other committee members for critical comment.

According to the Complaint, on April 8, 2007, Smart sent a seventh e-mail (Answer, exhibit G) stating:

> M.R. is a Caucasian female in her sixties . . . M.R. appears to be quite satisfied with her job of mentoring the young black woman . . . Indeed, M.R. is in the habit of trotting out her black graduate students to put on a show of their academic prowess . . . I do believe that M.R. is helping to make our department the laughing stock of Academe. (Complaint ¶ 31.)

The Complaint alleges that Plaintiff "reported Smart's continued harassment" following the April 2 and 8, 2007 e-mails. (Complaint ¶¶ 44-45).

After proceeding through the EEOC complaint process, Plaintiff filed her suit on April 4, 2007. The Complaint alleges a racially discriminatory "hostile environment" under two counts.

The first count alleges a violation by the University of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (2007). The second count alleges a violation of the DCHRA by both the University and Smart. D.C. Code §§ 2-1401.01 *et seq.* (2007). Smart is separately represented in this lawsuit.

## THE ANSWER

The University is filing its Answer on July 11, 2007, concurrently with this motion. The Answer contains as exhibits the various e-mails referenced in the Complaint. The University believes that the content of the e-mails is undisputed.

The University's Answer also includes a copy of an e-mail that was sent to Smart on January 13, 2006 by Dr. James Davis, the Chair of the Department of Modern Languages and Literature. (Answer ¶ 46, exhibit I.) In this e-mail, Dr. Davis "appeal[ed]" to Smart to "consider stop sending the type of emails you have been sending." (Id.) Dr. Smart responded the same day that he would

send "[n]o more e-mails." (Id.)   Dr. Davis sent his e-mail a full week before Plaintiff first

complained on January 20, 2006 about Smart's e-mails. (Complaint ¶ 34.)

Dr. Davis's e-mail request to Smart was effective, inasmuch as Plaintiff does not complain

about any further e-mails from Smart until April 2, 2007.

The April 2, 2007 e-mail (Answer ¶ 30, exhibit F) does not contain any references to

Plaintiff's race, but was directed instead to a three-member committee (including Plaintiff) that

rejected Smart's application for appointment to the Department's Graduate Faculty.[2]  Plaintiff sent

an e-mail complaining about Smart's April 2, 2007 e-mail, but she did not complain that it was

racially harassing. (Answer ¶ 44, exhibit I.)

Smart's April 8, 2007 e-mail directs criticism at one of Plaintiff's graduate students, but only

contains a passing reference to Plaintiff's race. (Answer ¶ 31, exhibit G.)

Plaintiff complained to Dr. Davis, the Department Chair, about Smart's comments about

the graduate student in his April 8, 2007 e-mail.  However, as indicated by the University's Answer

(¶ 44 and exhibit J), Plaintiff did not complain to the University that this e-mail (or the one on April

2, 2007) was discriminatory or was creating a "hostile environment" towards Plaintiff.

As indicated by the Answer, Dr. Davis, the Department Chair, also took immediate

corrective actions.   He sent Smart and e-mail on April 8, 2007 stating that "I am extremely angry

and disappointed about this email for the student's sake." (Answer, exhibit L.)   The same day, Dr.

Dr. Davis followed up with a letter reprimanding Smart and requesting again that Smart cease

sending e-mails concerning student performance. (Answer ¶ 46, and exhibit M.)

## PROCEDURAL HISTORY

Plaintiff filed her original Complaint on April 4, 2007.

---

[2]     Only members of the Graduate Faculty are permitted to serve as thesis or dissertation
advisors for graduate students.

On May 14, 2007, Plaintiff's counsel served extensive discovery requests on the University, including: First Set of Interrogatories; First Request for the Production of Documents; First Request for Admissions; and a Notice for a Rule 30(b)(6) Deposition of the University on 15 different topics.

On May 23, 2007, the University filed a motion to dismiss the original complaint, and to stay discovery. Plaintiff's discovery requests were attached as Exhibit A to the supporting memorandum.

In response to the University's motion, Plaintiff filed her Amended Complaint on June 6, 2007. With the Court's approval by Minute Order dated June 13, 2007, the University's time to file a dispositive motion or Answer to the new pleading was extended to July 11, 2007. The Court separately extended to July 11, 2007 the date for defendant Smart to submit his Answer or a dispositive motion. Smart also filed a motion for a stay of discovery pending the resolution of the defendants' dispositive motions.

## ARGUMENT

### A. THE STANDARD FOR DISMISSAL UNDER RULES 12(b)(6) AND 12(c)

Under Fed. R. Civ. P. 12(b)(6), a Complaint may be dismissed "for failure to state a claim upon which relief can be granted." In <u>Rattigan v. Gonzales</u>, 2007 U.S. Dist. LEXIS 39227 (D.D.C. May 31, 2007) (J. Huvelle), this Court recently reviewed the standards for evaluating a motion to dismiss a discrimination claim.

As the Court explained in <u>Rattigan</u>:

> As the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 2007 U.S. LEXIS 5901 (May 21, 2007), a complaint must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Id.* 2007 U.S. LEXIS 5901 [S. Ct.] at 1974 (rejecting the traditional 12(b)(6) standard set forth in *Conley v.*

> *Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). The
> allegations in plaintiff's complaint are presumed true at this stage and
> all reasonable factual inferences must be construed in plaintiff's
> favor. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 311 U.S.
> App. D.C. 224, 52 F.3d 373, 375 (D.C. Cir. 1995). However, "the
> court need not accept inferences drawn by plaintiffs if such
> inferences are unsupported by the facts set out in the complaint. Nor
> must the court accept legal conclusions cast in the form of factual
> allegations." *Kowal v. MCI Communications Corp.*, 305 U.S. App. D.C.
> 60, 16 F.3d 1271, 1276 (D.C. Cir. 1994). To survive a motion to
> dismiss the factual allegations in the complaint "must be enough to
> raise a right to relief above the speculative level." *Bell Atl.*, 127 S. Ct.
> at 1965, 2007 (U.S. LEXIS 5901.

<u>Rattigan</u>, 2007 U.S. Dist. LEXIS 39227, at *17-18 (footnote omitted).

Under Fed. R. Civ. P. 12(c), after the pleadings are closed, "any party may move for judgment on the pleadings." The standard to be applied in a motion under Rule 12(c) "is the same as that under Rule 12(b)(6)." <u>Egilman v. Keller & Heckman, LLP</u>, 401 F. Supp. 2d 105, 109 (D.D.C. 2005). Rule 12(c) has special utility in this case in which the allegations arise out of a series of writings, whose contents speak for themselves and are undisputed. These writings are attached to the Answer.

As we show next, the Complaint fails to state a claim upon which relief can be granted, and for that reason it should be dismissed.

## B.    BASED ON THE ALLEGATIONS, PLAINTIFF CANNOT ESTABLISH THAT THERE WAS AN ACTIONABLE "HOSTILE ENVIRONMENT"

The factual allegations in Plaintiff's Complaint, even if all taken as true, are legally insufficient to establish a "hostile environment" under Title VII. Nor are they actionable under the DCHRA, which is construed consistently with Title VII.[3] <u>McCain v. CCA of Tennessee, Inc.</u>, 254

---

[3] "The legal standard for discrimination under the DCHRA is substantively the same as under Title VII." <u>Dickerson v. SecTek, Inc.</u>, 238 F. Supp. 2d 66, 73 (D.D.C. 2002); <u>Arthur Young & Co. v. Sutherland</u>, 631 A.2d 354, 361-62 (D.C. 1993).

F. Supp. 2d 115, 120 (D.D.C. 2003) (the DCHRA's legal standards for a hostile environment claim are the same as those under Title VII).

The Complaint's allegation of a "hostile environment" is based on five "offensive" e-mails, written over the course of four consecutive days in January 2006 by a dissident faculty member, and two more e-mails written almost 15 months later in early April 2007. These are the only racially "hostile" acts alleged during the course of Plaintiff's 18-year career at the University where, by her own account, she has "been given increasing levels of responsibility" and performed leadership functions. (Complaint ¶17.) Three of the e-mails (Complaint ¶¶ 26, 29, 30; Answer, exhibits B, E and F) make no comment at all about Plaintiff's race.

Moreover, most of the e-mails simply direct toward Plaintiff the same types of critical comments that Dr. Smart has made about the University generally, including its many Black faculty and administrators. There was no physically threatening conduct. The e-mails at most were isolated, offensive utterances made in the sort of sharp-tongued and eccentric debate often found in academia.

To establish a claim for a discriminatory "hostile environment" under Title VII, a plaintiff must prove that a workplace is "permeated with 'discriminatory intimidation, ridicule and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation omitted). Factors to be considered are "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." 510 U.S. at 23.

The "conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (emphasis added). "[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to a

discriminatory changes in the 'terms and conditions of employment.'" Id.  The standards for judging hostility "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Id.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  In order for an actionable "hostile environment" to exist, the conduct "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (emphasis added).

There are important, further limitations on "hostile environment" claims.  As this Court has held in a sex discrimination case, with the ruling adopted by the D.C. Circuit, Title VII "does not prohibit all forms of workplace harassment, only those directed at discrimination because of sex." Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002).  Furthermore, "workplace harassment does not violate Title VII merely because the 'words have sexual content or connotation,' but only if members of one sex are disadvantaged in the terms and conditions of their employment because of the harassment." (Id.)

Crass or rude comments alone are not unlawful, because Title VII does not "serve as a remedy for all instances of verbal or physical harassment, for it does not 'purge the workplace of vulgarity.'" Stewart, 275 F.3d at 1133 (citation omitted).

In Stewart, the Court and D.C. Circuit ruled that "[e]ven a few isolated incidents of offensive conduct do not amount to actionable harassment." 275 F.3d at 1134 (emphasis added).  This principle is critical here.  At most, the e-mails sent by Dr. Smart are "isolated instances of offensive conduct." They were not "physically threatening," nor were they "frequent" but rather they were clustered in a four-day period without any recurrence until two more e-mails (one with no racial reference) were sent almost fifteen months later in April 2007.  Harris, 510 U.S. at 23.

The long gap between the January 2006 e-mails, and the two in April 2007, also defeat the claim.  As this Court has held based on the Supreme Court's holdings, to sustain an harassment

claim "the alleged incidents must be 'more than episodic'; they must be sufficiently <u>continuous</u> and concerted in order to be deemed pervasive."[4] <u>Carter v. Greenspan</u>, 304 F. Supp. 2d 13, 24 (D.D.C. 2004)(J. Huvelle) (emphasis added), *quoting* <u>Faragher</u>, 524 U.S. at 787 n. 1. *See* <u>Akonji v. Unity Heathcare, Inc.</u>, 2007 U.S. Dist. LEXIS 30060, at *36 (D.D.C. April 24, 2007) ("the five alleged discrete acts of harassment that [plaintiff] experienced – the first four occurring within the first three months of her employment and the final act occurring more than a year later – were isolated incidents not 'sufficiently continuous and concerted' to be deemed pervasive"). Plaintiff's claim fails this test.

This Court's recent ruling in <u>Rattigan</u> is especially apposite here. After reciting the general principles governing hostile-environment claims, the Court explained that "a hostile environment claim must be based on incidents comprising 'one unlawful employment practice' of intimidation, insult and ridicule that pervades plaintiff's <u>day-to-day</u> working life." 2007 U.S. Dist. LEXIS 39227, at 58 (citation omitted, emphasis added). Accordingly, the Court dismissed a hostile-environment claim filed by a Muslim employee based, *inter alia*, on allegations that supervisors made comments about "cut[ting] [his] balls off," accused him of "disloyalty," and that he was "threatened" with a demotion unless he selected a position from several vacancies. <u>Id</u>. at *59. Dozens of "hostile" acts were alleged. <u>Id</u>. at *57. The Court ruled that "[t]hese various disparate comments, spread out over a period of two years, do [not] amount to the type of severe harassment contemplated by Title VII." <u>Id</u>. at *59-60.

---

[4]     *See* <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 753 (4th Cir. 1996) (incidents of sexual harassment occurring intermittently over a seven-year period with gaps between incidents as long as a year is likely insufficient to establish Title VII liability); <u>Chaple v. Johnson</u>, 453 F. Supp. 2d 63, 75 (D.D.C. 2006) (no hostile environment could be found "since the actions took place during several different time periods").

The e-mails at issue in this case pale in comparison to the comments alleged in <u>Rattigan</u>.   In this case, there is no allegation that anyone threatened Plaintiff with physical injury; no one accused her of being disloyal to the University; and no one threatened her with a change in her terms of employment and Smart (as nothing more than a fellow faculty member) had no power to do so. Moreover, Plaintiff here alleges only seven hostile acts, as compared to the dozens in <u>Rattigan</u>.

Numerous other courts have dismissed "hostile environment" claims alleging a greater number of incidents than those alleged here, occurring more frequently.   *E.g.*, <u>George v. Leavitt</u>, 407 F.3d 405, 416-17 (D.C. Cir. 2005) (statements by three employees over a six-month period telling a plaintiff to "go back where [she] came from," and separate acts of yelling and hostility, were isolated instances that did not rise to the level of severity necessary to find a hostile work environment); <u>Hussain v. Nicholson</u>, 435 F.3d 359, 365-68 (D.C. Cir.) (although plaintiff alleged twelve instances of disparaging conduct by his employer, no reasonable jury could find a hostile environment because several claims were exaggerated and the remaining alleged behavior was not extreme), *cert denied*, 127 S. Ct. 494 (2006); <u>Akonji</u>, 2007 U.S. Dist. LEXIS 30060, at *35 (dismissing hostile environment claim as insufficiently "severe" based on "five discrete acts" of harassment [including touching] "over the two-year period as well as infrequent in appropriate comments and staring"); <u>Singh v. United States House of Representatives</u>, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004); <u>Jones v. Potter</u>, 301 F. Supp. 2d 1, 9-10 (D.D.C. 2004); <u>Bryant v. Brownlee</u>, 265 F. Supp. 2d 52, 65 (D.D.C. 2003) ("[a] few discrete incidents of racially-discriminatory remarks by co-workers do not suggest that the entire catalog of facially neutral actions by plaintiff's employer were, in fact, racially motivated").   Consistent with these authorities, Plaintiff's claims should be dismissed.

Finally, while the anti-discrimination laws certainly apply to the University and faculty members like Dr. Smart, the Court should be wary of intruding into the Constitutionally protected area of academic freedom.   The courts have recognized that the First Amendment protects the right

of faculty members to engage in academic debates and pursuits, and to express controversial ideas and opinions, even if outside "a pall of orthodoxy." Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967).[5] "Academic freedom thrives . . . [in] the independent and uninhibited exchange of ideas among teachers and students . . .." Regents of the Univ. of Michigan v. Ewing, 474 U.S. 214, 225 n. 12 (1985).  Several of Dr. Smart's e-mails can be read as simply commenting on issues of public concern respecting the appropriate role of a Historically Black University, and as challenging the views of the various persons including both Black University faculty and administrators as well as Dr. Roof, rather than as attacking Plaintiff based on her race.[6]  As such, the Constitutional protection given the expression of such views on public issues should be honored by the Court, and such communications (provocative but not racially harassing) should not be considered as part of a "hostile environment."

### C.    THE UNIVERSITY HAS NO VICARIOUS LIABILITY FOR DR. SMART'S ALLEGEDLY "HARASSING" COMMUNICATIONS

Even if Dr. Smart's communications are deemed to have created a "hostile environment," as a matter of law the University could not have any vicarious liability given the allegations of the Complaint.

---

[5]    The Supreme Court has "long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329 (2003).

[6]    The e-mails generally can be construed as "lamentations" about the "Plantation" atmosphere at the University, rather than as about Plaintiff's race. Brownlee, 265 F. Supp. 2d at 65 ("it is debatable whether Ms. Ng's comments could be construed as racially harassing" as they could be "reasonably construed as laments about the presence of racial discrimination in government").

In cases of harassment by <u>supervisors</u>, employers have an affirmative defense to Title VII liability as outlined in <u>Faragher</u>.[7]  The Complaint, however, does not allege that Dr. Smart supervised Plaintiff.  The fact that he had a higher rank (Professor vs. Associate Professor) is of no moment absent an allegation that Dr. Smart had some supervisory authority over Plaintiff.[8]  <u>Mikels v. City of Durham</u>, 183 F.3d 323, 331-32 (4th Cir. 1999), *cited with approval in* <u>Curry v. District of Columbia</u>, 195 F.3d 654, 659 (D.C. Cir. 1999), *cert. denied*, 530 U.S. 1215 (2000).

In a case, like this, of alleged <u>co-worker</u> harassment, the employer "may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."[9]  <u>Curry</u>, 195 F.3d at 660.  *See* <u>Carter v. Greenspan</u>, 304 F. Supp. 2d 13, 26 (D.D.C. 2004)(J. Huvelle).

In this case, the Complaint itself indicates that Smart ceased sending offensive e-mails in January 2006 after January 12, only three days after his first e-mail on January 9.  (Complaint ¶¶ 23-29, 34.)  Plaintiff's first complaint about the alleged harassment occurred on January 20, 2006, after the alleged, harassing conduct of January 9-12, 2006 was already <u>completed</u>.  Accordingly, it is not relevant whether the University took "corrective action" or not, because there was nothing further

---

[7]    Where, as here, the employee has not been subject to a "tangible" adverse "employment action," the employer can escape liability if it shows that it (a) "exercised reasonable care to prevent and correct promptly any . . . harassing behaviour, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  <u>Faragher</u>, 524 U.S. at 807.

[8]    Smart's e-mail of April 2, 2007 indicates that, in actuality, Plaintiff sat on a committee that had authority <u>over</u> Smart academic status and denied his application for membership in the Graduate Faculty.  (Complaint ¶ 30; *see* Answer ¶ 30 and exhibit F.)

[9]    Plaintiff's allegation that the University did not respond to Plaintiff's EEO complaint is irrelevant, because "Title VII does create a cause of action for the mishandling of an employee's discrimination complaints."  <u>Woodruff v. Peters</u>, 2007 U.S. Dist. LEXIS 34127, at *17  (D.D.C. May 9, 2007).

to correct in that period. <u>Jarvis v. Simatron International, Inc.</u>, 223 F. Supp.2d 981, 987 (N.D. Ill. 2002) (employer is not liable when, after the plaintiff complained, the co-worker "did 'not really' bother her again").

If the Court goes beyond the Complaint to the exhibits to the Answer, it also is undisputed that the University successfully acted on January 13, 2006 to put a halt to Plaintiff's transmission of e-mails of type that Smart first started sending only four days earlier on January 9, 2006. (Answer ¶ 46 and exhibit K.) The Department Chair, Dr. Davis, appealed to Smart to halt his e-mails, and Smart agreed to do so. The University took this action seven days <u>before</u> Plaintiff first complained about it (January 20, 2006). As a matter of law, Plaintiff cannot complain that the University failed to take prompt and corrective action when it did so after only four days, and one week before Plaintiff even complained. *See* <u>Carter</u>, 304 F. Supp.2d at 26 (no vicarious liability where the employer acted "quickly and reasonably" to a plaintiff's complaint). It is of no moment that the University "took no formal disciplinary action" because "the clear, prompt admonitions were appropriate and, at least for this conduct, effective." <u>Curry</u>, 195 F.3d at 661.

That leaves only the April 2 and 8, 2007 e-mails, which are temporally far removed from the January 2006 e-mails and addressed different issues. The University cannot be vicariously liable based on those two e-mails because, by themselves, they could not meet the strict legal standard for "harassment." This is especially so since the Complaint does not allege that the April 2, 2007 e-mail contained any reference to Plaintiff's race. (Complaint ¶ 30; *see* Answer ¶ 30 and exhibit F.) An employer must have actual or constructive knowledge of "harassment" before it can be held vicariously liable. <u>Curry</u>, 195 F.3d at 660.

The exhibits to the Answer – which cannot be disputed – also demonstrate that the University, through Dr. Davis, took swift action on April 8, 2007 to reprimand Plaintiff for the actions that Plaintiff complained about. (Answer ¶¶ 46, exhibits L and M.) Plaintiff herself did not

complain that either of the April 2007 e-mails included any elements of racial harassment, even though she had already filed an EEOC charge.  (Complaint ¶ 38; Answer ¶¶ 44-45, exhibits I and J.) As of June 7, 2007, when Plaintiff filed her Amended Complaint, there is no evidence of continuing e-mails or other allegedly "harassing" conduct.[10]

In short, based on the pleadings and indisputable written communications, Plaintiff cannot establish the University's vicarious liability for Dr. Smart's e-mails.

### D.    THE COURT SHOULD STAY DISCOVERY

Plaintiff unreasonably insists on commencing intensive discovery while this motion to dismiss is pending.  Plaintiff's counsel launched a blitz of discovery, including interrogatories, document requests, requests for admissions, and a deposition notice for a 15-topic Rule 30(b)(6) deposition, before this case has even reached the starting gate of the Rule 26(f) conference.[11] (Defendant Howard University's Motion to Dismiss [filed on May 23, 2007], Exhibit A.)

Unless a stay is of discovery is granted, the University risks having to incur a substantial burden and expense even if the Court grants this motion within a few weeks.  In that eventuality, Plaintiff will certainly not offer to compensate the University.  The net result will be an unnecessary and pointless waste of attorneys fees and expenses which could have been used by the University for worthwhile causes such as scholarships, research, and caring for the ill at the University's hospital.

---

[10]    The "appropriate corrective action" expected of employers is that "which is reasonably designed to stop coworker harassment."   Coles v. Kelly Services, Inc., 287 F. Supp. 2d 25, 31-32 (D.D.C. 2003), aff'd, 2004 U.S. App. LEXIS 15116 (D.C. Cir. 2004).  On each occasion when Smart sent allegedly harassing e-mails, the University acted promptly and the alleged harassment ceased.

[11]    Plaintiff's service of discovery was premature.  Local Civil Rule 26.2(a) provides that, with certain exceptions that are inapplicable, "a party may not seek discovery from any sources before the parties have conferred as required by Rule 26(f), F. R. CIV. P."  Yet Plaintiff served her discovery requests before the Rule 26(f) conference.

It is well settled that "trial courts are vested with broad discretion to manage the conduct of discovery." Chavous v. District of Columbia Financial Responsibility and Management Assistance Authority, 201 F.R.D. 1, 2 (D.D.C. 2001). A "stay of discovery pending the determination of a dispositive motion 'is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources.'" Id. (citation omitted). These principles apply here.

There is no particular cause for Plaintiff's urgency. This case involves allegations respecting a grand total of seven e-mails, all of which Plaintiff has in her hands. There is no reason to fear that any short delay, while this motion to dismiss is pending, will prejudice Plaintiff in any way. At issue here is pointless zeal by Plaintiff, and nothing else.

Pursuant to Fed. R. Civ. P. 26(c), the Court should therefore grant a protective order precluding discovery until after it has ruled on this motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Amended Complaint. The Court should also stay Plaintiff's efforts to take discovery pending this Court's ruling on the University's motion to dismiss the Amended Complaint.

Respectfully submitted,

Daniel I. Prywes (D.C. Bar No. 342394)
Stacey Terry Ormsby (D.C. Bar No. 490995)
BRYAN CAVE LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005
Phone: (202) 508-6000
Fax:     (202) 220-7394

Dated:  July 11, 2007                    Counsel for Defendant Howard University

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DR. MARY ROOF,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )
                                  )
HOWARD UNIVERSITY                 )        Civil Action No. 1:07-CV-00639 (ESH)
                                  )
    and                           )
                                  )
Dr. IAN I. SMART                  )
                                  )
        Defendants.               )
                                  )

## ORDER

Upon consideration of the foregoing motion by defendant Howard University to dismiss

plaintiff Mary Roof's Amended Complaint or, in the alternative, for judgment on the pleadings, and

for a stay of discovery, and upon consideration of any opposition thereto, defendant Howard

University's reply, and the entire record;

IT IS HEREBY ORDERED:

1.  The motion is GRANTED.

2.  Discovery is stayed until further Order of the Court.  If the Court does not dismiss the

    case, the schedule for the University to respond to Plaintiff's discovery requests will be

    set forth in the Court's Pre-Trial Order to be issued under Fed. R. Civ. P. 16(e).

3.  Plaintiff's Amended Complaint against defendant Howard University is dismissed with

    prejudice.

_____
Judge Ellen S. Huvelle
United States District Judge

Copies to:

R. Scott Oswald, Esq.
Adam Augustine Carter, Esq.
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006

**Counsel for Plaintiff**

Daniel I. Prywes, Esq.
Stacey T. Ormsby, Esq.
BRYAN CAVE LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005

**Counsel for Defendant Howard University**

John F. Karl, Jr., Esq.
Karl & Tarone
900 17th Street, NW, Suite 1250
Washington, DC  20006

**Counsel for Defendant Ian Smart.**