UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. MARY ROOF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07-cv-00639 |
| | ) Hon. Ellen S. Huvelle |
| HOWARD UNIVERSITY, | ) |
| and | ) |
| DR. IAN I. SMART, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF DR. MARY ROOF'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO DEFENDANT HOWARD
UNIVERSITY'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR A
JUDGMENT ON THE PLEADINGS, AND FOR A STAY OF DISCOVERY**

Plaintiff Dr. Mary Roof ("Roof"), by and through counsel, hereby files this Memorandum of Points and Authorities in Opposition to Defendant Howard University's ("Howard") Motion to Dismiss, or in the Alternative, for a Judgment on the Pleadings, and for a Stay of Discovery. Roof's Amended Complaint has clear allegations and offers clear evidence in support of Roof's claims. Co-Defendant Dr. Ian I. Smart's ("Smart") race-based harassment of Roof over a period of 16 months and targeting nearly 50 of Roof's superiors, colleagues, and students, was both severe *and* pervasive. Moreover, because Howard had contemporaneous knowledge of Smart's harassment and failed to take appropriate corrective action, Howard racially discriminated against Roof by enabling a hostile work environment. This Court should deny Howard's motion

1

to dismiss and likewise should deny its meritless motion for judgment on the pleadings. Finally, Howard's request for a stay of discovery is precipitous, as discovery has not yet commenced. Accordingly, this Court should deny Howard's motion in its entirety.

## FACTUAL BACKGROUND

A Caucasian, Roof is a minority faculty member at Howard, a "Historically Black College and University" ("HBCU"), where both the faculty and student body are majority African American. *See* Amended Complaint ¶¶ 2, 13–16. Roof is a tenured Graduate Associate Professor of Spanish and Faculty Member of Howard's Department of Modern Languages and Literatures. *See id.* ¶ 18. An African descendant, Smart is a tenured Professor and Senior Faculty Member of Howard's Department of Modern Languages and Literatures. *See id.* ¶¶ 19-20. Smart is also the author of the racially-charged *Dude, Where's My HBCU?*, a book detailing Smart's perception that Howard's identity as a "Historically Black College and University" is tarnished because it operates like a Civil War-era plantation for its majority African-American student body. *See id.* ¶ 21. Moreover, Smart maintains a personal blog in which he writes about Howard's purported decline into a Civil War-era plantation. *See id.* ¶ 22.

Over a 16 month period, Smart has sent a series of unprovoked and offensive e-mails that allude to Roof as a privileged Caucasian plantation mistress. *See id.* ¶ 3. Smart's e-mails are directed at nearly 50 of Roof's students, colleagues, and superiors at Howard, including the Chairman of the Department of Modern Languages and Literatures, Dr. James J. Davis ("Davis"), tenured faculty, tenure-track faculty, instructors, lecturers, student teaching assistants, and administrative staff. *See* Amended Complaint ¶¶ 3, 23.

Smart's overtly racist and derogatory e-mails include his January 9, 2006, allegations that Roof doubts "the viability and even the validity of any graduate program in modern languages

and literature at a 'Negro' college, even at the 'Mecca.'" *See id.* ¶ 24. In his e-mails, Smart asserts that Roof has privileged status at Howard because she is Caucasian. *See id.* ¶ 27. Indeed, in his January 11, 2006, e-mail Smart states "Who is this Mary [. . .] Roof? Does she enjoy some special privileged status here at the principal Uncle Tom's Campus?" Smart referred to Roof as "an apparently Caucasian woman in her sixties" who "is at best a mediocre scholar" and who "customarily sets the academic bar for both her undergraduate and graduate students at mediocrity." *See id.* In his January 10, 2006, e-mail Smart proclaims that the very thought of Roof holding a position of power in the Department of Modern Languages and Literatures is "just a horrible nightmare." *See id.* ¶ 26.

Despite Roof's January 11, 2006, request of Smart to retract his statements and Howard's contemporaneous knowledge of Smart's e-mails, Smart's harassment only escalated. *See id.* ¶ 28. In a second January 11, 2006, e-mail, Smart alludes to Roof as a plantation mistress, stating "Ah done wrong. My bad. Ah done gone and get Miss Mary mad. Ah sure is a real stupid nigger. Ah hope you all intercede with Miss Mary for me. Ah done gone and mess up again. Miss Mary is de best ting dat could of ever happen to we in dis Department. She does talk Spanish like a native; and she best friend does speak French. So, ah trow mehself at Miss Mary feet. Ah beg she to give me a break dis time. Ah is just one dumb niggerman from de Islands. Allyou talk to she for me." *See* Amended Complaint ¶ 28.

Left unchecked by Howard, Smart only went further. In a January 12, 2006, e-mail, Smart claims that like the founder of Howard, Roof is a white supremacist. *See id.* ¶ 29. Smart states that Howard's founder Major General Oliver Otis Howard "did not intend that his university would do more than train Negroes to fit into white society as second-class citizens. The Howard University Graduate School of Arts and Sciences demonstrated that it espouses and enforces this approach to the (mis-)education of Negroes through its handling of the Ph.D.

3

program in Romance Languages and its general handling of the graduate program in the Department of Modern Languages and Literatures [. . .] Dr. [. . .] Roof has repeatedly renewed her membership in the Graduate School of Arts and Sciences [. . .] Dr. [. . .] Roof has, then, repeatedly reaffirmed her adherence to the philosophy of the Graduate School of Arts and Sciences.  I will let you draw the conclusion for yourself." *See id*.

Despite Howard's contemporaneous knowledge of Smart's harassment of Roof, Howard failed to take formal disciplinary or corrective action against Smart.  When Howard finally did respond on January 13, 2006, to Smart's ongoing harassment of Roof, Chairman Davis merely e-mailed Smart stating "I know that I can't control your freedom of speech/writing.  I simply appeal to you to *consider* stop sending the type of emails you have been sending in the past two weeks . . "  *See* Answer to Amended Complaint, Ex. K (emphasis added).

Because Howard did not take corrective action, Smart's race-based harassment of Roof only continued.  Indeed, in an April 2, 2007, e-mail, Smart compares a three-member committee on which Roof sits with characters in his racially-charged book *Dude, Where's My HBCU*?  *See* Amended Complaint ¶ 30.  In an April 8, 2007, e-mail, Smart derides Roof as "a Caucasian female in her sixties [. . .] M.R. appears to be quite satisfied with her job of mentoring the young black woman [. . .] Indeed, M.R. is in the habit of trotting out her black graduate students to put on a show of their academic prowess [. . .] I do believe that M.R. is helping to make our department the laughing stock of Academe." *See id*. ¶ 31.

In addition to Howard's contemporaneous knowledge of Smart's harassment, Roof also put Howard on notice on January 20, 2006, by submitting a formal complaint, detailing Smart's harassment, and requesting that Howard intervene and take corrective action.  *See id*. ¶¶ 33-34.  Howard officials acknowledged receipt of Roof's complaint on January 25, 2006, but did not inquire further or offer Roof any instruction.  *See id*. ¶ 35.

4

As a result of Howard's failure to take corrective action, Roof was forced to turn to the EEOC with her complaint of Smart's ongoing and unmitigated harassment. On March 11, 2006, Roof reported the discrimination to the EEOC. *See id.* ¶ 37. Roof filed her discrimination complaint with the EEOC on April 27, 2006. *See id.* ¶ 38. Yet again, Howard acknowledged receipt of Roof's complaint, this time before the EEOC, but did not offer any instruction or inquiry. *See id.* ¶ 39. On December 7, 2006, the EEOC issued a Letter of Determination, finding reasonable cause that Howard violated Title VII because it knowingly failed to respond to the harassment that created a hostile work environment for Roof. *See* Amended Complaint ¶ 40. On January 3, 2007, the EEOC issued Roof a Notice of the Right to Sue which Roof received on January 9, 2007. *See id.* ¶ 42.

On April 2, 2007, Roof reported to Howard officials Smart's continued harassment. *See id.* ¶ 44. Again, Howard did not respond. On April 4, 2007, Roof filed her Complaint with this Court. Despite this, Howard continued to fail to act and Smart continued to harass Roof. Indeed, on April 8, 2007, Roof reported Smart's continued harassment to Howard officials. When Howard did respond to Smart's April 8, 2007 e-mail, Chairman Davis merely wrote Smart a letter, dated April 8, 2007 stating "My major concern is that you have embarrassed, in my opinion, a graduate student in a public forum: the internet." *See* Answer, Ex. M. In Davis's April 8 letter and a subsequent April 9, 2007 e-mail, he neither reprimanded Smart nor issued corrective action regarding Smart's April 2 and April 8, 2007, harassing e-mails about Dr. Roof. *See id.* Exs. L & M.

On June 6, 2007, Roof filed her Amended Complaint. As of the date of this filing, Howard has not issued any corrective action.

## **STANDARD OF REVIEW**

A complaint should not be dismissed for failure to state a claim unless it fails to "'plead enough facts to state a claim to relief that is plausible on its face.'" *See Rattigan v. Gonzales*, Slip Copy, 2007 WL 1577855 at * 6 (D.D.C. 2007) (Huvelle, J.) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). At the same time, "'a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination.'" *See Twombly*, 127 S. Ct. at 1960 (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 (2002)). When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must presume that the allegations in the complaint are true and draw "all reasonable factual inferences" in favor of the plaintiff. *See Rattigan*, at * 6. Thus, in determining whether Roof's claims against Howard may be dismissed, the Court must evaluate whether Roof has "raised a right to relief above the speculative level," assuming the facts which she alleges, and all logically flowing inferences, are true and in her favor. *See id.*

The standard of review for a Fed. R. Civ. P. 12 (c) motion for judgment on the pleadings is "essentially the same as that for motions to dismiss under Rule 12(b)(6)." *See Fay v. Perles* 484 F. Supp. 2d 12, 13 (D.D.C. 2007) (citing *Schuchart v. La Taberna Del Alabardero, Inc.,* 365 F.3d 33, 35 (D.C. Cir. 2004); *Ramirez v. Dep't of Corrections,* 222 F.3d 1238, 1240-41 (10th Cir. 2000); *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987); *Does I through III v. District of Columbia,* 238 F. Supp. 2d 212, 216 (D.D.C. 2002)). As with a motion to dismiss, when considering a motion for judgment on the pleadings, the Court "may not rely on facts outside the pleadings and must construe the complaint in the light most favorable to the non-moving party." *See Fay*, 484 F. Supp. 2d at 13 (citing *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

**ARGUMENT**

I.   **HOWARD'S MOTION TO DISMISS SHOULD BE DENIED.**

   A.   **Smart's Unwelcome Harassment of Roof and Howard's Failure to Stop the Harassment Created a Hostile Work Environment Under Title VII and the DCHRA.**

Smart's unwelcome, harassing e-mails, combined with Howard's failure to reprimand Smart or take any corrective action to stop the harassment, created a hostile work environment under Title VII and the DCHRA.  Discriminatory conduct results in a hostile work environment when it is "so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin," thus offending "Title VII's broad rule of workplace equality."  *Park v. Howard University*, 71 F.3d 904, 906 (D.C. Cir. 1995); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  To constitute a hostile work environment, the conduct "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  The facts of the instant case meet each of these tests for determining the existence of a hostile work environment.

   1.   *Smart's Harassment of Roof Was Severe and Pervasive, Thus Creating a Hostile Work Environment.*

Smart's harassment of Roof was both severe *and* pervasive, and thus changed the conditions of Roof's employment at Howard, creating a hostile working environment.

The United States Supreme Court has stated that whether alleged discriminatory conduct creates a hostile work environment and violates Title VII depends on the *totality of the circumstances*, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [N]o single factor is required."  *See Harris*,

7

510 U.S. at 21-23 (emphasis added); *see also Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). Conduct is actionable if it is either "sufficiently severe *or* pervasive." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986) (emphasis added). The Court has further stipulated that discriminatory conduct that is sufficiently continuous and concerted will be deemed pervasive. *See Faragher*, 524 U.S. at 787 (citing *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (holding that harassment that occurred daily over two week period was pervasive enough to create hostile working environment for victim) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (holding that few, random outbursts of racial epithets and degrading obscenities did not occur in concert or with regularity that could reasonably be termed pervasive))).

      Howard argues that Smart's discriminatory and harassing e-mails were not frequent, but rather "isolated incidents of offensive conduct," and thus do not give rise to a hostile work environment claim. *See* Motion to Dismiss at 11. However, as the Supreme Court articulated in *Morgan*, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Howard's argument that Smart's e-mails harassing Roof were merely individual incidents "clustered in a four-day period without any recurrence until two more e-mails," does not overcome a hostile environment claim. *See* Motion to Dismiss at 11. On the contrary, this series of harassing e-mails is the foundation for the hostile environment claim; all the e-mails "collectively constitute one 'unlawful employment practice.'" *See Morgan*, 536 U.S. at 117. Moreover, as the Court emphasized in *Harris* and again in *Oncale*,

8

frequency is only one of the factors a court should consider when determining the existence of a hostile work environment. *See Harris*, 510 U.S. at 23; *see also Oncale*, 523 U.S. at 81-82. Thus a lack of frequency alone is insufficient to defeat a hostile work environment claim. The truer test, as articulated and reaffirmed many times by the Court, is whether the discriminatory acts are, "sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment." *See Meritor*, 477 U.S. at 67 (emphasis added); *Morgan*, 536 U.S. at 116; *Oncale*, 523 U.S. at 79; *Faragher*, 524 U.S. at 786; *Harris*, 510 U.S. at 21.

  Howard argues that Smart's harassing e-mails were not sufficiently severe or pervasive to uphold a hostile environment claim. *See* Motion to Dismiss at 13. However, Howard cites various authorities to support this claim that are not analogous to the instant case. *See, e.g.*, *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 55 (D.D.C. 2004) (holding that requirements of hostile work environment not satisfied where claim was based entirely on plaintiff's belief that alleged harassment of her was because she was only non-Caucasian staff member); *Jones v. Potter*, 301 F. Supp. 2d 1, 9-10 (D.D.C. 2004) (holding that one incident of harassment that was not repeated is not pervasive or severe enough to alter plaintiff's working conditions). In the instant case, Smart harasses Roof because she is a Caucasian woman, as he explicitly and implicitly states in the majority of his e-mails. *See* Answer ¶¶ 27-28, 30, Exs. C, D, F. Further, Smart's harassment of Roof was repeated many times, even after she e-mailed him, asking that he retract his e-mails. *See* Answer ¶¶ 26-31, Exs. B-G.

  Smart's harassment of Roof was both sufficiently severe *and* pervasive to "alter the conditions of the victim's employment and create an abusive working environment." *See Meritor*, 477 U.S. at 67. Smart's harassment was severe. Smart singled out Roof repeatedly because of her race; Roof is a Caucasian professor at a majority black university. *See* Amended

9

Complaint at ¶¶ 13-16. Smart imputed his bigoted feelings to Roof and explicitly averred that she treated her black students as second-class citizens. *See id.* at ¶¶ 27-29. Smart also attacked Roof's competency as a professor and scholar, the very skills that form the backbone of her profession. *See id.* at ¶ 27. Smart's harassment was also undeniably pervasive. Pervasive is defined as "of an unwelcome influence or physical effect spreading widely throughout an area or a group of people." *See* New Oxford Dictionary of English 1387 (1998). Smart sent his series of e-mails to at least 46 of Roof's superiors, colleagues, and students, exposing his harassment throughout Roof's entire professional community. *See id.* at ¶¶ 23, 30-31. Smart's race-based impugnation of Roof's academic credentials was sent not only directly to Roof, but also to all those within her professional sphere of influence, and thus, clearly pervaded Roof's entire work environment.

  Howard's allegation that Smart's e-mails were separate, "isolated" incidents does not negate the fact that they were sufficiently continuous and concerted. During the first episode of Smart's harassment of Roof, Smart sent e-mails daily, each day going further in his degradation and discrimination against Roof. When Roof reported the problem to Howard officials, they took no formal action, in essence condoning and affirming Smart's harassment and leaving Roof to feel that the entirety of the Howard community agreed with Smart's discriminatory comments about her. *See Faragher*, 524 U.S. at 789.

  Howard argues that the intervening months during which Smart did not send discriminatory e-mails destroy any argument that Smart's harassment was frequent enough to create a hostile environment. *See* Motion to Dismiss at 11-12. However, as the discriminatory conduct was repeated, even though there was a period of calm between some of the harassing incidents, the recurring harassment created a pattern of hostility, as the target and topic of the e-mails were so strikingly similar. The Supreme Court has held, and this Court has affirmed, that

10

even an intervening period without further discriminatory conduct can still create a hostile work environment, as long as each act is part of a "pervasive pattern of hostility and ridicule." *Dickerson v. Sectek, Inc.*, 238 F. Supp. 2d 66, 84 (D.D.C. 2002) (Huvelle, J.); *see also Morgan*, 536 U.S. at 118 (holding that as incidents constituting hostile work environment are part of same unlawful employment practice, it does not matter if there is intervening period of inactivity, so long as incidents are still part of same claim). Recently, in *Kriesch v. Johanns*, this Court found that incidents occurring over a period of nine years were severe and pervasive enough to constitute a hostile environment, regardless of periods without discriminatory acts. *See* 468 F. Supp. 2d 183, 188 (2007) (holding that coworker's harassing comments over period of nine years and employer's failure to respond to victim's complaints was sufficient to state claim for hostile work environment under Title VII). As in *Kriesch*, Howard's refusal to take formal action to reprimand Smart or put an end to his discriminatory and harassing e-mails have created a hostile work environment for Roof.

      To maintain a hostile work environment claim, the plaintiff need not provide tangible effects that her productivity has declined as a result of the harassment, but need only show that the harassment made it more difficult to do her job. *See Gray v. Greyhound Lines, East*, 545 F.2d 169 (D.C. Cir. 1976). In addition, a plaintiff does not need to prove "a tangible psychological injury" to prove the existence of a hostile work environment. *See Harris*, 510 U.S. at 21. Abusive work environments, even those that do not seriously affect an employee's emotional well-being, "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *See Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998) (citing *Harris*, 510 U.S. at 22). As a result of Smart's unprovoked and unwelcome attacks, Roof has experienced stress, anxiety, pain, mental duress, and distraction that interfere with her research, writing, and ability to participate in

11

functions and programs at Howard. *See* Amended Complaint at ¶ 32. Smart's inclusion of graduate students as recipients of his e-mails has also served to undermine Roof's authority with her students, an action that D.C. courts, and this Court in particular, have held to be "intolerable." *See Dickerson*, 238 F. Supp. 2d at 84-85; *see also Daka*, 711 A.2d 86 at 97. Smart's repeated efforts to target Roof and undermine her authority with her students and colleagues, combined with Howard's refusal to intervene and correct the situation, made it difficult for Roof to focus on her work and also caused her stress, anxiety, pain and mental duress. This interference with Roof's ability to perform her job is evidence that Smart's harassment and Howard's inaction created a hostile work environment for Roof.

Looking at the totality of the circumstances, as required by the standard set forth by the Supreme Court, Smart's harassment of Roof and Howard's failure to intervene or reprimand Smart for his behavior, created a hostile work environment for Roof. This Court has previously held that given the fact-intensive nature of hostile work environment claims, such claims are rarely appropriate for summary judgment. *See Dickerson*, 238 F. Supp. 2d at 85; *see also Armstrong v. Reno*, 172 F. Supp. 2d 11, 24 (D.D.C. 2001). An even higher standard should apply to the instant motion at this pre-discovery stage of the case. Accordingly, this Court should find that the allegations in Roof's complaint are sufficient to state a hostile work environment claim under Title VII and the DCHRA and are more than sufficient to withstand Howard's motion to dismiss.

> 2. *Smart's Unwelcome Harassment of Roof Does Not Fall Within Academia's First Amendment Right to "Engage in Academic Debates and Pursuits, and to Express Controversial Ideas and Opinions."*

Howard further argues that Smart was acting within his constitutionally protected right to free speech when he "challenge[ed] the views of the various persons including…Dr. Roof…" *See* Motion to Dismiss at 14. However, Smart's unwelcome harassment of Roof does not fall

within academia's First Amendment right to "engage in academic debates and pursuits, and to express controversial ideas and opinions." *See id*. Howard's argument is without merit because the First Amendment does not give unlimited protection to speech. Smart crossed the line.

The Supreme Court has affirmed various limitations imposed on the First Amendment's guarantee of the protected right to free speech. *See, e.g.*, *Miller v. California*, 413 U.S. 15, 23-24 (1973) (setting out standard for determining when obscene materials are not protected by First Amendment); *New York Times Co. v. Sullivan*, 376 U.S. 254, 282-83 (1964) (holding that if there is proof of actual malice, public figure may hold speaker liable for damages to his reputation caused by publication of defamatory falsehood); *Schenck v. United States*, 249 U.S. 47, 52 (1919) (holding that freedom of speech would be limited when it presented a "clear and present danger" to the United States government; also holding that the right to "[shout] fire in a crowded theater" is not protected).

Smart was not engaged in an academic debate when he sent his derogatory e-mails, but rather an employment debate. *See* Answer ¶¶ 26-31, Exs. B-G. It was this employment debate that gave rise to Smart's race-based harassment of Roof. Howard avers that "Dr. Smart's e-mails can be read as simply commenting on issues of public concern . . . and as challenging the views of various persons . . . rather than as attacking [Roof] based on her race." *See* Motion to Dismiss at 14. In reality, however, Smart's e-mails single out Roof because of her race and harass and degrade her. As this Court noted in *Saunders v. George Washington University*, "discrimination on the basis of one's skin color is the very antithesis of the liberal discourse and dialogue upon which the idea of the university is founded." *See* 768 F. Supp. 843, 846 (D.D.C. 1991). Thus, Smart's e-mails do not fall under a special Constitutional protection for academic speech.

13

**B.      Because Howard Had Contemporaneous Knowledge of Smart's Harassment of Roof Yet Failed to Implement Reasonable Corrective Action, Howard Engaged in Racial Discrimination Against Roof by Enabling a Hostile Work Environment.**

Howard asserts erroneously that because Smart's racially-motivated harassment of Roof on January 9, 10, 11, and 12, 2006, was seemingly "completed" before Roof filed a formal complaint with the University, Howard is not vicariously liable. *See* Motion to Dismiss at 15. An employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) "if the employer knew or should have known of the harassment but failed to implement prompt and appropriate corrective action." *Curry v. District of Columbia,* 195 F.3d 654, 660 (D.C. Cir. 1999) (citing *Faragher*, 524 U.S. at 799). Howard officials, including the Dean and Associate Dean of the College of Arts and Sciences and the Chair of the Department of Modern Languages and Literatures, were on notice during *each* of Smart's seven incidents of race-based harassment of Roof, yet failed to take appropriate corrective action. Because Howard officials received each of Smart's five January 2006 e-mails, they knew or should have known of Smart's race-based harassment of Roof. Even if Howard officials did not read the daily e-mails sent by Smart in January 2006, and therefore, arguably did not know of the harassment, they *should have known* because they were direct recipients of the e-mails. *See* Answer, Exs. C, D, E, F, G, & J. Moreover, contrary to Howard's confused assertion, January 12, 2006, did not mark the completion of Smart's ongoing harassment of Roof; Smart continued to send offensive, unwelcome, and harassing e-mails about Roof into 2007. *See* Amended Complaint ¶¶ 30-31. Howard enjoyed *both* prior notice and contemporaneous knowledge of this ongoing harassment of Roof in 2007, which took place after Roof filed both a formal complaint with Howard on

January 20, 2006, and – due to Howard's failure to take appropriate action – a complaint with the EEOC on April 27, 2006.[1]

To state a claim under Title VII, Roof was under no obligation to inform Howard of "situations which [Howard] 'knew or should have known.'" *Turner v. Barr*, 811 F. Supp. 1, 4 (D.D.C. 1993). Although employers "may not be held responsible when they 'could not have known of the possible problem,'" an employer also "may not blindly ignore situations for which it can be 'charged with actual or constructive knowledge.'" *Id.* (quoting *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 350 (8th Cir. 1988)). Like in *Turner*, where this Court found that acts of race-based discrimination, such as grouping employees of the same race in a certain section of the office, "could not escape the notice of reasonably vigilant employer. . . ," Smart's repeated and overtly race-based, harassing e-mails were inescapable to their direct recipients: Howard officials. *Id*.

Howard also asserts erroneously that because Chairman Davis asked Smart to "consider" his request to stop sending e-mails of "the type. . . you have been sending. . . ." it can avoid liability. *See* Motion to Dismiss at 16; Answer ¶ 46, Ex. K. Contrary to Howard's assertions, Chairman Davis's request was neither effective in putting a "halt" to Smart's harassment of Roof, which continued into 2007, nor a "clear,. . . appropriate, [or] . . .for this conduct, effective" response to Smart's harassment of Roof. *See Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999). In *Curry*, the D.C. Circuit stated that to determine whether an employer has responded appropriately to a coworkers' harassment, courts should assess "the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings,

---

[1] In Howard's Answer to the Amended Complaint, Howard admits receipt of Roof's January 20, 2007 complaint which included a letter and attachments outlining in detail Smart's ongoing race-based harassment of Roof. *See* Answer at ¶ 34.

reprimands in personnel files, or termination, and whether or not the measures ended the harassment." 195 F.3d at 662 n. 17 (quoting *Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999)). Not only did Chairman Davis merely ask Smart to "consider" his request, he prefaced that undeniably meek request by stating "I know I can't control your freedom of speech/writing." *See* Motion to Dismiss at 16; Answer ¶ 46, Ex. K. In so doing, Davis implied that Smart's harassment of Roof was protected conduct and abdicated his responsibility to maintain an orderly workplace that is free of racial harassment. Howard clearly fails to meet the standard articulated by the court in *Curry*; Howard failed to take appropriate remedial action against Smart and Chairman Davis's request that Smart "consider" ceasing his harassment of Roof undeniably failed to end the harassment.

The fact that there was a period of time between Smart's January 2006, harassment of Roof and his ongoing harassment into April 2007, is of no consequence. Hostile work environment claims are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *See Akonji v. Unity Healthcare, Inc.*, Slip Op., 2007 WL 1207194 at * 5 (D.D.C. 2007) (quoting *Morgan,* 536 U.S. at 117). Accordingly, such claims "cannot be reduced to a single action on a single day because their 'very nature involves repeated conduct,' and are based on the 'cumulative effect of individual acts.'" *See Akonji* at * 5 (quoting *Morgan*, 536 U.S. at 115). In fact, "'even if there are significant gaps in the occurrence of the acts constituting the unitary hostile work environment claim," the claim may be valid. *See Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 892 (D.C. 2003) (quoting *Morgan,* 536 U.S. at 115).

Finally, Howard argues unconvincingly that following Smart's April 8, 2007, Howard allegedly "took swift action." *See* Motion to Dismiss at 16. In reality, Howard sent Smart a letter dated April 8, 2007 and an e-mail dated April 9, 2007 addressing Howard's concern about Smart's comments in his April 8, 2007 e-mail as they related to a graduate student discussed in

16

that e-mail. *See id*. at 16; Answer ¶ 46, Exs. L & M.  At no point in either Howard's letter or its e-mail did Howard address or take corrective action against Smart for his blatant and racially-motivated harassment of Roof.  *See id*.  As such, Howard cannot claim that its allegedly "swift action" caused Smart's harassment of Roof to "cease" anymore than Roof can claim that her civil suit on April 4, 2007, had that effect.  *See* Motion to Dismiss at 17 n. 10.

It is clear that the facts, if taken as true, demonstrate that Howard had contemporaneous knowledge of Smart's litany of discriminatory e-mails.  Despite this, Howard failed to implement prompt, appropriate, and corrective action.  As such, Howard is vicariously liable for Smart's ongoing harassment of Roof.

## II.     HOWARD'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED.

Smart's race-based harassment of Roof was both severe *and* pervasive.  Because Howard had contemporaneous knowledge of Smart's harassment of Roof, yet failed to take appropriate corrective action, Howard racially discriminated against Roof by enabling a hostile work environment.  For these and all of the reasons articulated in Section I *supra*, and since the standards of review are the same, the Court should deny Howard's motion for judgment on the pleadings as well.

## III.    BECAUSE DISCOVERY HAS NOT YET COMMENCED, IT SHOULD NOT BE STAYED.

Although discovery has not yet commenced, Howard asks this court to stay discovery pending determination of its dispositive motion.  *See* Motion to Dismiss at 18.  Because Howard's request is premature, Howard's Motion should be denied.

17

For the very procedural reason Howard seeks to justify this Court's stay of discovery, its request is precipitous.  Howard argues that this Court should grant its motion to stay discovery because "a party may not seek discovery from any sources before the parties have conferred as required by Rule 26(f)" *See id*. at 17 n. 11.  Roof served courtesy copies of her first discovery requests upon Howard on May 14, 2007.  *See* Motion to Dismiss at 8.  In its Motion, Howard fails to recognize that Roof's requests state that Defendant Howard is "required to respond within thirty (30) days from the date of the Local Rule 16.3 Conference."  *See* Howard University's Motion to Dismiss filed on May 23, 2007, Ex. A.  As such, the trigger date for Howard's responses to Roof's discovery requests is the date of the Conference.  Because parties have not yet conferred pursuant to Local Rule 16.3, discovery clearly has not commenced and, as such, does not merit a stay.

Further, Howard argues unconvincingly that this Court should grant a stay of discovery because "[u]nless a stay of discovery is granted, the University risks having to incur a substantial burden and expense . . . ."  *See* Motion to Dismiss at 17.  Both this Court and the Federal Rules of Civil Procedure favor the efficient use of judicial resources and administration of justice.  *See* Fed. R. Civ. P. 1 ([The Federal Rules] "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding").  It would be inefficient for this Court to grant a stay of discovery, precluding any progression in the case, merely because Howard claims unconvincingly that it will suffer a financial set-back.  In fact, rather than suffering any prejudice by Roof's service of courtesy copies of her first discovery requests, Howard benefits; indeed, Howard has been afforded substantially more than 30 days to respond to Roof's discovery requests.

Accordingly, Howard's Motion for a Stay of Discovery should be denied.

## CONCLUSION

WHEREFORE, and for all the foregoing reasons, Defendant Howard University's Motion to Dismiss, or in the Alternative, for a Judgment on the Pleadings, and for a Stay of Discovery, should be DENIED.

## REQUEST FOR A HEARING

Plaintiff requests an oral hearing on all issues.

Respectfully submitted,

/s/ Adam Augustine Carter
R. Scott Oswald, DC Bar No. 458859
Adam Augustine Carter, DC Bar No. 437381
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
acarter@employmentlawgroup.net
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of July, 2007, a true and correct copy of the foregoing Plaintiff Dr. Mary Roof's Memorandum of Points and Authorities in Opposition to Defendant Howard University's Motion to Dismiss, or in the Alternative, for a Judgment on the Pleadings, and for a Stay of Discovery has been served upon the following via ECF:

Daniel I. Prywes, Esq.
BRYAN CAVE
700 Thirteenth Street, N.W.
Washington, D.C. 20005-3960

*Counsel for Defendant Howard University*

and

John F. Karl, Jr.
Karl & Tarone
900 Seventeenth Street, N.W.
Suite 1250
Washington, D.C. 20006

*Counsel for Defendant Dr. Ian I. Smart*

         /s/ Adam Augustine Carter
         Adam Augustine Carter