UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. MARY ROOF, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 07-639 (ESH) |
| HOWARD UNIVERSITY, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Mary Roof, a Caucasian professor at Howard University, has sued Howard for racial discrimination, alleging a hostile work environment in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.* Before the Court is defendant's motion to dismiss or in the alternative for judgment on the pleadings. As explained herein, the Court will grant defendant's motion.

## BACKGROUND

Howard is a "historically black" university with a predominantly African American faculty and student body. (Am. Compl. ¶¶ 2, 15.) Plaintiff has been employed at Howard for approximately eighteen years, and is currently a tenured Graduate Associate Professor of Spanish and faculty member of Howard's Department of Modern Languages and Literatures. (*Id.* ¶¶ 17, 18.) Professor Ian Smart, who is of African descent, is also a faculty member of Howard's Department of Modern Languages and Literatures and a tenured Professor of Spanish. (*Id.* ¶¶ 19, 20.)

Between January 9, 2006 and January 12, 2006, Smart sent a series of five e-mails addressed to approximately forty-six Howard graduate students, staff, and faculty, including

plaintiff. (*Id.* ¶¶ 23-29; Answer Exs. A-E.) The first e-mail contained a critique of the Modern Languages and Literatures department's leadership, including an accusation that plaintiff[1] doubted "the viability and even the validity of any graduate program in modern languages and literature at a 'Negro' college." (Am. Compl. ¶ 24; Answer Ex. A.) A second e-mail on January 10 referred to plaintiff and two other professors as "blind mice" in their potential capacity to administer the department, and it recounted a "nightmare" in which plaintiff was a "brigadier general" in charge of the department. (Am. Compl. ¶ 26; Answer Ex. B.) The following morning, Smart sent a third e-mail describing plaintiff as an "apparently Caucasian woman in her sixties" and a "mediocre scholar," and suggesting that she "enjoy[ed] some special privileged status" at "Uncle Tom's Campus." (Am. Compl. ¶ 27; Answer Ex. C.) This e-mail copied sections of an earlier e-mail from plaintiff demanding retraction of the two prior e-mails and threatening legal action if he did not. (Answer Ex. C.) Two hours later, Smart sent a fourth e-mail written in dialect: "Deer Kolleegees: Ah done wrong. . . . Ah done gone and get Miss Mary mad. . . . So ah trow mehself at Miss Mary feet. Ah beg she to give me a break dis time. Ah is just one dumb niggerman from de Islands. . . . Grovelengly yours, Uncle Ian de Pan-Plantation Darkie . . . P.S. . . . And don't forget about the book signing this Saturday at 2:00p.m. in KARIBU BOOKS, THE MALL AT PRINCE GEORGE'S. I promise to put on a great show. Tell everybody about it. It will be a blast." (Am. Compl. ¶ 28; Answer Ex. D.) Smart's fifth e-mail on January 12 claimed that Howard's founder intended only to "train Negroes to fit into white society as second-class citizens," that Howard's Graduate School of Arts and Sciences "enforces this approach," and that plaintiff has "repeatedly affirmed her adherence" to this

---

[1] The email actually referred to an unnamed colleague, but defendant does not appear to dispute plaintiff's contention that the statement referred to her.

philosophy.  (Am. Compl. ¶ 29; Answer Ex. E.)  The e-mail concluded by inviting the reader to "draw the conclusion for yourself."  (Answer Ex. E.)

The following day (January 13), Professor James Davis, Chairman of the Department of Modern Languages and Literatures, sent Smart an e-mail in which he "appealed" to Smart to "consider stop sending the type of emails you have been sending in the past two weeks." (Answer Ex. K.)  Smart replied later that morning:  "No problem, James.  No more e-mails." (*Id.*)  The next week, plaintiff sent Davis a letter "detailing Smart's harassment and requesting that Howard intervene and take corrective action."  (Am. Compl. ¶ 34.)  Davis acknowledged receipt of the letter on January 25, 2006 (*id.* ¶ 35), and the following day, he sent a letter to Dr. James Donaldson, Dean of the College of Arts and Sciences asking for advice in dealing with plaintiff's complaint.  (*Id.* ¶ 36; Answer Ex. H.)

On March 11, 2006, plaintiff reported the allegedly discriminatory harassment involving Smart's e-mails to the Equal Opportunity Employment Commission ("EEOC"), and the following month she filed a formal complaint of discrimination.  (*Id.* ¶¶ 37-38.)  The EEOC issued a Letter of Determination in December, finding reasonable cause to believe that Howard violated Title VII because it knowingly failed to respond to harassment creating a hostile work environment.  (*Id.* ¶ 40.)  In January 2007, Roof received a Notice of the Right to Sue from the EEOC.  (*Id.* ¶ 42.)

In April 2007, nearly fifteen months after the original series of e-mails, Smart sent two additional e-mails which plaintiff claims were part of the same pattern of harassment.  (Am. Compl. ¶¶ 30, 31; Answer Exs. F, G; Pl.'s Opp'n at 4, 8.)  These e-mails apparently followed the decision of a three-member faculty panel, which included plaintiff, to reject Smart's appointment to the Department's Graduate Faculty.  (*See* Answer Ex. F; Def.'s Mem. at  7.)  In an e-mail dated April 2, 2007, addressed to approximately thirty-five Howard faculty and staff members,

3

Smart lambasted the teaching methods of members of the panel, including plaintiff, and accused them of having "long memories." (Am. Compl. ¶ 30; Answer Ex. F.) Plaintiff complained to Davis about this e-mail the same day. (Am. Compl. ¶ 44; Answer Ex. I.) Smart sent another e-mail to a group of approximately forty-nine faculty members on April 8, 2007, which referred to plaintiff as a "Caucasian female in her sixties," criticized the academic work of one of plaintiff's graduate student mentees as "woefully deficient," and alleged that plaintiff has a "habit of trotting out her black graduate students to put on a show." (Am. Compl. ¶ 31; Answer Ex. G.)

In response, plaintiff immediately sent Davis an e-mail complaining that the "unprovoked" "harassment of a student by [Smart]" cannot "go unchallenged," imploring Davis to "act now." (Am. Compl. ¶ 45; Answer Ex. J.) In a formal letter dated the same day, Davis wrote Smart expressing "major concern" that the April 8 e-mail "embarrassed" a graduate student in a "public forum." (Answer Ex. M.) After warning Smart that plaintiff was pursuing legal action against Smart and Howard, Davis concluded the letter by "ask[ing] that [Smart] stop sending emails regarding student performance," and stating his belief that such e-mails "are in violation of privacy rules and regulations." (*Id.*) Davis also sent Smart an e-mail on April 9, 2007, declaring himself "angry and disappointed" over Smart's April 8 e-mail. (Answer Ex. L.) Smart responded by accusing Davis of "hiding behind the students," and claiming that his actions were "in the best interest of all of […] Howard University."[2] (*Id.*)

In the midst of the April 2007 e-mail exchange, plaintiff filed suit against both Howard and Ian Smart under Title VII and the DCHRA, alleging a racially discriminatory hostile work environment. Plaintiff subsequently moved for voluntary dismissal of defendant Smart pursuant to Federal Rule of Civil Procedure 41(a)(1). Defendant has now moved for dismissal, or in the

---

[2] Plaintiff's motion to strike defendant's Exhibit 1, an emailed apology from Smart to a group of Howard faculty, will be granted, for the Court has not considered it in its evaluation of defendant's motion.

4

alternative for judgment on the pleadings, arguing that plaintiff has failed to allege a *prima facie* case under Title VII or the DCHRA because Smart's seven e-mails are insufficient as a matter of law to rise to the level of a hostile work environment. (Def.'s Mem. at 9.) Defendant also argues that Howard cannot be held vicariously liable for Smart's conduct in any event because it took appropriate corrective action in response to Smart's e-mails. (*Id.* at 15.)

## ANALYSIS

**I.    Legal Standard**

A complaint must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). At this stage, all reasonable factual inferences must be construed in plaintiff's favor, and all allegations in the complaint are presumed true. *Maljack Prods., Inc., v. Motion Picture Ass'n of Am., Inc.,* 52 F.3d 373, 375 (D.C. Cir. 1995). "However, the court need not accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Comm'cns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). To survive a motion to dismiss, the factual allegations of the plaintiff "must be enough to raise a right to relief above the speculative level." *Bell Atl.,* 127 S. Ct. at 1965. A motion for judgment on the pleadings is governed by the same standard as that under Rule 12(b)(6). *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 109 (D.D.C. 2005). "Where the pleadings present disputed questions of material fact," the motion for judgment on the pleadings must be denied. *Id.* (quoting G*eorge C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir. 1977)).

## II. Hostile Work Environment Claim

Plaintiff claims that Smart's seven e-mails sent between January 9 and January 13, 2006, and April 2 and April 8, 2007, created a hostile work environment of pervasive harassment based on plaintiff's race in violation of Title VII and the DCHRA. (*See* Pl.'s Opp'n at 8.) Because "the legal standard for discrimination under the DCHRA is substantively the same as under Title VII," the Court will consider both claims together. *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 73 (D.D.C. 2002).

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 US 101, 117 (2002) (internal quotation marks omitted). A work environment is considered "hostile" under Title VII only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). To determine whether a work environment is sufficiently "hostile" to support a Title VII claim, the Court must look at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The "conduct must be *extreme* to amount to a change in the terms and conditions of employment." *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998) (emphasis added). "[O]ffhand comments[] and isolated incidents (unless extremely serious)" do not meet this standard. *Id.* By ensuring that "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable," *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002), these standards are "sufficiently demanding to

6

ensure that Title VII does not become a general civility code." *Faragher,* 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 80) (internal quotation marks omitted). Moreover, Title VII "does not prohibit all forms of workplace harassment," but only harassment based on a person's membership in a class protected by Title VII. *Stewart*, 275 F.3d at 1133.

      Plaintiff argues that Smart's e-mails were "overtly racist" and constituted "race-based harassment" because they "allude[d]" to plaintiff "as a privileged Caucasian plantation mistress." (Pl.'s Mot. at 2, 4; Am. Compl. ¶ 3.) However, plaintiff must demonstrate that conduct is not merely "tinged" with offensive connotations, but actually constituted "discrimination because of" membership in a protected class. *Oncale*, 523 U.S. at 81. Of the seven e-mails, four make absolutely *no* reference or allusion to plaintiff's race. (Answer Exs. A, B, E, F.) Nor do any of the e-mails actually call plaintiff a "white supremacist," as she claims. (Am. Compl. ¶ 29.) Indeed, many of the criticisms of plaintiff seem to be part of a general and rambling critique of the pedagogical "philosophy" and administration of Howard's graduate school. (*See* Answer Exs. A, B, E, F.) Thus, it is far from clear that whatever harassment plaintiff experienced was undertaken because of her race. *See Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir. 1999) (rejecting a hostile work environment claim where only three of fifteen incidents had racial overtones); *Irvine v. Video Monitoring Servs. of Am., L.P.*, No. 98 Civ. 8725, 2000 WL 502863, at *4 (S.D.N.Y. May 4, 2000) (finding that four "arguable age-based" derisive e-mails "reflected a clash of personalities between co-workers and general animosity rather than specifically age-based harassment").

      But even assuming *arguendo* that the alleged harassment was racially motivated, plaintiff's claims must fail, for "a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart,* 275 F.3d at 1134. The incidents of harassment must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed

pervasive." *Carter v. Greenspan*, 304 F. Supp. 2d 13, 24 (D.D.C. 2004). Plaintiff's opposition glosses over the nearly fifteen-month gap separating the January 2006 and April 2007 e-mails, claiming "harassment of Roof only continued." (Pl.'s Opp'n at 4.) On the contrary, it is apparent that two one-week periods of insulting e-mails interspaced by fifteen months of inactivity over the course of plaintiff's eighteen-year career at Howard cannot reasonably be considered "continuous" or "pervasive." *Carter*, 304 F. Supp. 2d at 24. Rather, these seven e-mails are the sort of isolated acts that courts have consistently rejected as the basis for Title VII claims.[3] *See Sprague v. Thorn Ams., Inc.,* 129 F.3d 1355, 1366 (10th Cir. 1997) (five allegedly discriminatory comments over sixteen months, while "unpleasant and boorish," were insufficient to create a hostile work environment); *Hopkins v. Balt. Gas & Elec. Co.,* 77 F.3d 745, 753 (4th Cir. 1996) (several discriminatory incidents spread over a seven-year period suggested the absence of a pervasive condition); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430-31 (7th Cir. 1995) (nine incidents of verbal harassment over seven months insufficient for a sexual harassment claim); *Akonji v. Unity Healthcare, Inc.*, Civ. No. 05-2101, 2007 U.S. Dist. LEXIS 30060, at *35 (D.D.C. Apr. 24, 2007) (five alleged acts of discrimination in two years as well as additional "inappropriate comments" insufficient to constitute hostile work environment); *Hadden v. Tex. Rehab. Comm'n*, Civ. No. C-04-447, 2005 WL 3078608, at *8 (S.D. Tex. Nov.

---

[3] Plaintiff also argues that Smart's harassment was not only pervasive, but "severe," because Smart "singled [her] out" and "attacked [her] competency as a professor and scholar, the very skills that form the backbone of her profession." (Pl.'s Opp'n at 9-10.) However, there were no aggravating circumstances surrounding the emails that would suggest particular severity, such as physical intimidation or threats of adverse employment action. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67 (1986) (upholding a claim for hostile work environment involving demands for sexual favors and even several forcible rapes); *Faragher*, 524 U.S. at 787-88 (whether the plaintiff is physically threatened is a factor in assessing hostility of work environment). Moreover, Smart's criticisms of plaintiff's academic prowess were not tied to her race, and Smart also criticized numerous other members of Howard's majority-black faculty. (*See* Answer Exs. A, C, F.) Indeed, Smart appears to be what the law has come to recognize as an "equal opportunity offender." *Schaadt v. St. Jude Medical S.C., Inc.*, No. 05-CV-1167, 2007 WL 978093, at *9 (D. Minn. Mar. 30, 2007).

8

16, 2005) (numerous sexually explicit jokes, e-mails and stories over a nineteen-month period were insufficiently "extreme" to support a *prima facie* case of hostile work environment); *Coles v. Kelly Servs., Inc.,* 287 F. Supp. 2d 25, 31 (D.D.C. 2003) (up to ten sexually explicit e-mails, "although certainly offensive and unprofessional, w[ere] not severe or pervasive enough to rise to the level of a hostile work environment"); *Irvine*, 2000 WL 502863, at *4 ("[F]our insulting e-mails and the several instances of banter alleged by plaintiff, while inappropriate in a work setting, and even arguably age-based, d[id] not rise to the level of pervasive or sufficiently severe conduct to establish an age-based harassment claim . . . .").

### III.   Howard's Vicarious Liability for Smart's Conduct

Finally, even if plaintiff could make out a claim of harassment against Smart based on the seven e-mails, which she cannot, she is unable to state a Title VII claim against Howard based on Smart's conduct. Where the harassment of an employee by a coworker is at issue, the employer is not strictly liable. Rather, the employer can be held liable only if it "knew or had reason to know of the harassment and failed to implement any prompt and appropriate corrective action." *Curry v. Dist. of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999). Plaintiff contends that because Howard officials were direct recipients of Smart's e-mails, Howard was aware of the harassment at the time of its occurrence and yet failed to take any appropriate corrective action. (Pl.'s Opp'n at 14.) On the contrary, however, it is undisputed that Davis appealed to Smart to stop sending offensive e-mails a full week before plaintiff complained to the administration. (*See* Answer Ex. K.) Plaintiff alleges that this "meek" response to Smart's e-mails was insufficient. (Pl.'s Opp'n at 15-16). However, after five days of e-mails, Smart stopped sending them, so there is no basis for suggesting that the remedy was ineffectual. When Smart next sent an e-mail to which plaintiff took offense, nearly fifteen months later, Davis immediately rebuked Smart in both an e-mail and a letter. (Answer Exs. F, I, M, G.) Plaintiff complains that Davis's reaction to Smart in

9

April 2007 focused on the Smart's criticism of a graduate student in a public forum, and not on "his racially motivated harassment of" plaintiff. (Pl.'s Opp'n at 17.) But since the only reference to plaintiff's race in these e-mails was an observation that plaintiff is a "Caucasian female in her sixties," the university can hardly be faulted for not treating the e-mails as racial harassment. (Answer Ex. G.) Indeed, even plaintiff's own complaints about the April 2007 e-mails focused on the harm to the graduate student, and did not allege that she found the two e-mails to be racially harassing. (Answer Exs. I, J.) And, plaintiff does not allege that Smart continued to send e-mails after receiving Davis's April 8 letter and April 9 e-mail.

In assessing the reasonableness of an employer's response to harassment, the Court may consider "the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and *whether or not the measures ended the harassment.*" *Curry*, 195 F.3d at 663 n.17 (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)) (emphasis in original) (internal quotation marks omitted). Insofar as repeat conduct is concerned, the reasonableness of an employer's response "may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 676 (10th Cir. 1998)) (internal quotation marks omitted). Davis responded promptly to the first set of e-mails before plaintiff herself even complained about them, and after his response, Smart's offensive e-mailing ceased for fifteen months. After the second set of e-mails, Davis chose a somewhat harsher response, sending within a day both an e-mail rebuke and a more formal letter of admonishment. (Answer Exs. M, G.) Again, Smart's offensive e-mailing ceased. Thus, under the standards established in *Curry*, Howard took appropriate and effective corrective action, and Howard therefore cannot be held liable for

Smart's conduct. *See Curry*, 195 F.3d at 661 (finding employer's response to co-worker harassment adequate, though it did not involve formal disciplinary action, because its "clear, prompt admonitions were appropriate, and at least for th[at] conduct, effective").

## CONCLUSION

In sum, while Smart's e-mails may have been boorish and unprofessional, standing alone they do not, as a matter of law, rise to the level of a hostile work environment so severe that it altered the terms and conditions of plaintiff's employment. *See Faragher,* 524 U.S. at 788. Rather, they are the sort of "ordinary tribulations of the workplace" that Title VII -- which is not a "general civility code" -- cannot immunize employees against. *Id.* Moreover, because Howard reacted in a timely and appropriate manner to Smart's e-mails, it could not be held vicariously liable for his conduct. *See Curry*, 195 F.3d at 661. Accordingly, defendant's motion is granted, and the case is dismissed with prejudice.

                /s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:  August 17, 2007